UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LOUIS R. NAPOLI,                                :
                                                :
                    Plaintiff,        :     99 Civ. 1329 (GEL)
                                                :
      v.                                       :     **OPINION AND ORDER**
                                                :
FIRST UNUM LIFE INS. CO.,                       :     **FINDINGS OF FACT AND**
                                                :     **CONCLUSIONS OF LAW**
                    Defendant.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Richard J. Quadrino, Quadrino & Schwartz, P.C., Garden
City, NY, for Plaintiff Louis R. Napoli.

Louis M. Lagalante, Gallagher, Harnett & Lagalante,
LLP, New York, NY, for Defendant First Unum
Insurance Company.

GERARD E. LYNCH, District Judge:

       In this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001 *et seq.*, plaintiff Louis R. Napoli challenges a determination by defendant First Unum Life

Insurance Company ("First Unum") that he is not disabled within the meaning of a disability

insurance policy issued to his employer. The procedural history of the case is set out in this

Court's prior opinion. Napoli v. First Unum Life Ins. Co., No. 99 Civ. 1329 (GEL), 2005 WL

167598, at *1-2 (S.D.N.Y. Jan. 25, 2005). Briefly, First Unum moved for judgment on the

administrative record. Treating the motion as one for summary judgment, this Court (Hon. John

S. Martin, Jr.) granted the motion, holding that First Unum had properly found Napoli not

disabled. Napoli v. First Unum Life Ins. Co, No. 99 Civ. 1329 (JSM), 2003 WL 118504, at *3

(S.D.N.Y. Jan. 13, 2003). The Court of Appeals reversed by summary order, holding that

summary judgment was inappropriate because there were genuine issues of material fact created

by the difference of opinion between First Unum's expert and Napoli's treating physician as to whether it was medically advisable for Napoli to return to his job as a government bond broker. Napoli v. First Unum Life Ins. Co., No. 03-7092, 2003 WL 22454481, at *2 (2d Cir. Oct. 29, 2003). The Court remanded the matter to this Court, indicating that "the trier of fact may decline to consider any evidence that has not already been considered and may ultimately reach the same result" after a trial, even without hearing additional evidence. Id.

By the time the case returned to this Court on remand, Judge Martin had retired from the bench, and the case was reassigned to the undersigned. First Unum renewed its motion, arguing that this Court should accept the Second Circuit's invitation to dispense with further evidence. First Unum then asked this Court to reach the same conclusion as Judge Martin did, for the same reasons, and simply relabel the decision as a judgment on the administrative record rather than a grant of summary judgment. Napoli, in contrast, urged the Court to hear additional evidence, and to conclude that he is in fact disabled within the meaning of the policy.

Following the Second Circuit's decision in Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 293-296 (2d Cir. 2004), this Court held that in light of the Circuit's holding that this case turned on the resolution of credibility issues between the parties' respective experts, there was "good cause" within the meaning of Locher, 389 F.3d at 294, and DeFelice v. Am. Int'l Life Assurance Co. of N.Y., 112 F.3d 61, 66 (2d Cir. 1997), to expand the administrative record by taking live testimony from the two doctors. The Court would then decide the case "based on the full administrative record, as supplemented by any credible medical testimony presented at the hearing." Napoli, 2005 WL 167598, at *4.

A trial was held on March 31, 2005. Both witnesses provided their direct testimony in affidavit form, and were then subject to extensive cross-examination before the Court. The following constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On November 29, 1996, when he was 55, plaintiff Napoli, a government bond trader, had a heart attack and underwent bypass surgery. (AR 51-56, 161-62.)[1]

2. After successful surgery, Napoli was released from St. Francis Hospital on December 5, 1996. (AR 108, 161-62.)

3. Napoli's cardiothoracic surgeon, Dr. Paul S. Damus, noted in his discharge summary that:

> the patient's postoperative course was surprisingly benign. He had no further evidence of myocardial decompensation . . . . [The] patient made an uninterrupted recovery, ambulated without difficulty, and had no evidence of further myocardial de-compensation.

(AR 108.)

4. Napoli's treating cardiologist, Dr. Aaron Freilich, stated in his initial consultation report, dated December 13, 1996, that Napoli was "doing extremely well post surgery, without any complaints." (AR 174.)

5. After discharge from the hospital, Napoli underwent cardiac rehabilitative therapy, first at St. Francis Hospital in New York, and then at Brick Memorial Hospital in New Jersey. (AR 77, 127, 168-72.)

---

[1] "AR" refers to the Adminstrative Record, Appendix A, to First Unum's motion for judgment on the administrative record.

6. The recovery period for the type of surgery Napoli underwent (absent complications, and none were noted) is generally 12-16 weeks. (See AR 136.)

7. The policy at issue is a long-term disability policy First Unum issued to Napoli's former employer, Garban LLC (the "Policy"). Coverage under the policy was provided to Napoli as an employee benefit. (AR 32.)

8. The "Benefits" provision of the Policy sets forth the circumstances under which a benefit is payable, as follows:

> When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:
>
> 1. disability; and
>
> 2. regular attendance of a physician.
>
> The Proof must be given upon request and at the insured's expense.

(AR 021.)

9. Under the Policy, the insured is deemed "disabled" when he submits sufficient proof that "because of injury or sickness the insured . . . [cannot] perform each of the material duties of his regular occupation." (AR 023.)

10. "Elimination period" is defined as "a period of consecutive days of disability for which no benefit is payable. The elimination period is shown in the policy specifications and begins on the first day of disability." (AR 026.) The Policy's elimination period is 90 days. (AR 030.)

11. By a claim statement, dated March 18, 1997, Napoli sought long-term disability benefits under the Policy. (AR 49-56.)

12. By letter dated May 19, 1997, First Unum advised Napoli that his claim had been approved. Benefits were paid commencing February 28, 1997 (*i.e.,* after expiration of the 90-day elimination period). (AR 140-41.)

13. By letter dated September 4, 1997, based upon the medical information then in the administrative record, First Unum informed Napoli that it had determined he was no longer disabled under the Policy and, accordingly, that payment of benefits would cease as of September 3, 1997. (AR 194-95.)

14. In support of its decision, First Unum noted that Napoli had an uneventful post-operative course, and that Napoli had undergone a stress echocardiogram in January 1997, several weeks after his bypass surgery, at which time he exercised to 7 METS without ischemia or significant arrhythmia. (AR 194-95.)

15. In rendering its initial determination, First Unum's claims personnel consulted its on-site physicians. (AR 229, 235-36.)

16. As part of First Unum's review, Dr. Rosalie Mastropolo, one of First Unum's on-site cardiologists, contacted Napoli's physician, Dr. Freilich, on August 8, 1997. (AR 191.)

17. During his discussion with Dr. Mastropolo on August 8, 1997, Dr. Freilich stated that "[m]edically, [Napoli] could tolerate [a return to work], and if [Napoli] wanted to return to work, [I] would not suggest otherwise" and that Napoli "had work capacity and was able to do anything that he so chose other than heavy physical exertion." (Id.)

18. During its investigation of Napoli's claim for disability benefits, First Unum sought the opinions of vocational and rehabilitation consultants. (AR 126-31.)

19. Jackie Wilson, a certified rehabilitation consultant, visited Napoli at his home. (Id.) In her report, Wilson noted:

> Mr. Napoli considers himself to have left the labor force. He does not foresee a return to the [s]ecurities [i]ndustry and believes he is too old to secure a meaningful position anywhere else . . . . He is not interested in vocational rehabilitation.

(AR 126.)

20. By his attorney's letter, dated October 31, 1997, Napoli appealed First Unum's determination to decline further benefits. (AR 198-99.)

21. First Unum acknowledged receipt of Napoli's appeal by letter, dated November 4, 1997, and advised him that his claim had been transferred to First Unum's Quality Review Section for further review. (AR 200.)

22. First Unum's Quality Review Section asked Dr. John Dodge, who is an on-site board certified internist, to review Napoli's medical records. (AR 208. See also AR 218.) First Unum then obtained additional records from Napoli's physician, Dr. Freilich, showing that on December 8, 1997, now more than a year post-bypass surgery, Napoli underwent another stress test, which showed he was able to exercise to 12.6 METS with no electrocardiographic changes or chest pain. (AR 212, 242.) Dr. Dodge recommended a further review by another cardiologist. (AR 218.)

23. A review of the file was performed by Dr. Richard W. Nesto, Associate Professor of Medicine at Harvard Medical School, Co-Director of the Institute for Prevention of

Cardiovascular Disease, and Director of Clinical Research at Beth Israel Deaconess Medical Center in Boston. (AR 222.) In a report dated January 21, 1998, Dr. Nesto concluded, after reviewing Napoli's medical records:

> [T]he insured could physically perform a sedentary to light occupation. The physical exertion of being a stockbroker certainly lies in this area . . . [and] it appears reasonable . . . for the claimant to return to work as a stockbroker on this basis.

(Id.)

24. On January 30, 1998, First Unum faxed a copy of Dr. Nesto's report to Napoli's physician, Dr. Freilich, for comment. (AR 224.)

25. Dr. Karen Kurkjian, an on-site cardiologist, spoke by telephone with Dr. Freilich. (AR 248.) Dr. Kurkjian confirmed her conversation with Dr. Freilich in a letter dated February 17, 1998 (AR 232), which was countersigned by Dr. Freilich. The letter stated that Dr. Freilich "did not necessarily disagree" with aspects of Dr. Nesto's January 21, 1998 report. (Id.) However, Dr. Kurkjian also reported that:

> Dr. Freilich continues to support restriction from high-stress occupation . . . as he believes this contributed to the insured's development of atherosclerosis and would contribute to progression in the future.

(AR 248.)

26. On February 12, 1998, Dr. Kurkjian called Dr. Nesto. She discussed with him Dr. Freilich's concerns regarding Napoli's return to an alleged high-stress work environment. (AR 248.) Dr. Nesto reported that, while he believed there was some increased risk of myocardial infarction in a very stressful environment, the absolute risk was very small, and nearly non-quantifiable. (Id.) This was especially true, according to Dr. Nesto, in light of Napoli's treadmill

stress testing, where he reached 12.6 METS without difficulty. (Id.)

27. Based upon Dr. Nesto's evaluations and opinions, the review and evaluations of Drs. Kurkjian, Dodge and Mastropolo, and the other information in the file, the Quality Review Section informed Napoli, through his attorneys by letter dated March 2, 1998, that First Unum's declination of further benefits would be upheld. (See AR 278.)

28. In an affidavit dated March 2, 2002, Dr. Freilich continued to support Napoli's restriction from his high-stress occupation, believing an improved stress test result did not mean that Napoli could substantially perform the material duties of his occupation, and that his coronary heart disease could again exacerbate his heart condition. (3/2/02 Freilich Aff. ¶¶ 8, 11.)[2]

29. Dr. Freilich testified at the hearing on March 31, 2005. He impressed the Court as the sort of doctor any patient would wish for: intelligent, highly-qualified, well-informed, sympathetic, and scrupulously truthful. The Court fully credits his testimony, to the extent that the testimony reports his observations and clinical assessments.

30. However, two factors weaken his testimony, to the extent that it reports his opinions regarding Napoli's ability to return to work. First, as a treating physician, Dr. Freilich has every incentive – psychological, moral and even, in view of the risk of malpractice liability, financial – to take the most conservative possible view of Napoli's prognosis and treatment. It would accordingly be entirely natural for him, in doing his best to assure his patient's continued good health, to emphasize the risks facing the patient and to recommend the safest course possible.

---

[2] This affidavit is set forth at Appendix B to First Unum's motion for judgment on the administrative record.

Second, Dr. Freilich is entirely dependent on his patient, Napoli, for an account of the degree of stressfulness of Napoli's employment. As both Dr. Freilich and defendant's expert, Dr. Nesto, agreed, stress is a highly subjective matter; a job environment that may be stressful for one person may be experienced by another as challenging and stimulating. (Tr. 26-28, 52-54, 87, 107-08.) Dr. Freilich's assessment of the degree of stress experienced by Napoli, and therefore the risk perceived by Dr. Freilich, thus depends largely on Napoli's possibly self-interested self-report.

31. Napoli unquestionably worked in a high-pressure environment. The record contains a statement by Napoli's employer attesting to the competitive and stressful nature of the government bond market, the "physical[ly] and mentally demanding" nature of Napoli's responsibilities, and the extremely long hours demanded by his job. (AR 123.) The Court fully credits this account of Napoli's occupation. At the same time, the Court notes that many jobs appear more stressful to those who are not trained for and experienced in that profession. Dr. Freilich, for example, repeatedly emphasized that he would not like to work in the environment in which Napoli had to function, and that he would regard work of that sort as highly stressful (Tr. 28.) Many non-physicians, however, would surely find it stressful to have to make potentially life and death decisions about cardiac patients, a task that some cardiologists do not find overly stressful. (Tr. 53-54.) In short, without doubting that Napoli's occupation involves intense pressures that would be regarded as stressful by most people, the Court cannot fully rely on Dr. Freilich's assessment that the job was so extremely stressful as to cause significant risk to Napoli's health.

32. The Court specifically rejects one portion of Dr. Freilich's testimony. Dr. Freilich opined that the risk for Napoli of suffering another heart attack over an eight-year period following his first attack and bypass surgery if he returned to work was 15%, approximately half of which would be attributable to the stress of his job. (3/31/05 Freilich Aff. ¶¶ 30-33). First, the Court notes that in assessing Napoli's ability to return to work, only that portion of the risk which is attributable to his occupation is relevant. The fact that Napoli had a higher risk of mortality than an otherwise similar man of his age who lacked his cardiac history, even if he stayed at home, does not render him disabled from a position he is physically capable of performing. What would render him disabled within the meaning of the policy would be an increased risk to his health from performing his job. Second, Dr. Freilich cites no specific studies that quantify the increased risk of mortality from working as a bond trader, or indeed in any occupation, or with occupations characterized as "high-stress" in general. Dr. Nesto, who appeared to the Court as having a more thorough familiarity with the academic cardiology literature, testified flatly that "[t]here is no data to suggest that specific occupations, such as bond broker, are associated with an increase in risk for heart attack." (3/31/05 Nesto Aff. ¶ 13.) Accordingly, Dr. Freilich's numerical estimate of the risk appears to be insufficiently supported to be credible.

33. It is noteworthy that Dr. Freilich has stated that he would not oppose Napoli's return to work if he wanted to, indicating that Napoli's decision not to work was to some extent optional. (AR 191.) He also agreed that the daily absolute risk of a heart attack caused by Napoli's return to his occupation was so small as not to be quantifiable. (Tr. 96.)

34. Dr. Nesto also struck the Court as highly credible. His academic qualifications and record of publication are impressive, and he also struck the Court as humane, thoughtful,

experienced, and truthful. Dr. Nesto plainly spoke as an expert cardiologist, and not as a hired gun for the insurer, and the Court is confident of the integrity of his opinions. While Dr. Nesto's initial report (AR 222) appears to be based in part on an inaccurate perception of Napoli's work, as it refers to him as a generic "stockbroker," without an apparent understanding of the particular work of an active trader, that lack of awareness of Napoli's job duties is for the most part irrelevant to his testimony at trial, which concerned the general effect of psychological stress on the heart.

35. Dr. Nesto agreed that mental stress is a potentially negative vector for heart health. (Tr. 106.) He emphasized, however, that Napoli has had, and had already had by 1997, a remarkably successful post-operative history. By December 1997, Napoli was registering a score of 12.6 METS on a stress test. (AR 212.) As Dr. Freilich's report of that test indicates, this was 150% of the expected score (id.); indeed, it is better than normal for healthy individuals. Dr. Frielich credibly testified that this score is one of the prognostic indicators of future health. (Tr. 45.) Similarly, throughout this period, Napoli's "ventricular ejection factor," a measure of the blood expelled from the heart's chambers, hovered around 46% (see, e.g., AR 212), a rate just slightly below the normal range of 55-70% (Tr. 42).[3]

---

[3] Only one objective test posed a clearly negative result, and its significance divided the doctors. Dr. Freilich identified a four-beat run of unsustained ventricular tachycardia, and described this as posing a significant risk factor for Napoli. (Tr. 48; AR 171.) Dr. Nesto disagreed, reading the test results as indicating only three beats of ventricular tachycardia. (Tr. 113.) However, it is noteworthy that this test result was not stressed by Dr. Freilich in his direct testimony, where it was mentioned only in passing as a general phenomenon without reference to the specific test results. (3/31/05 Freilich Aff. ¶¶ 34, 35.) The Court thus does not find this dispute to be of major evidentiary significance, and rejects any conclusion that this indicator should alter the conclusions stated in the text.

11

36. Dr. Nesto evaluated Napoli as ranking in the top 5% of post-bypass patients in terms of his recovery to normal health. (Tr. 119.) Dr. Freilich evidently did not disagree – while he placed Napoli in "Class 2" for activity restriction (Class 1 constitutes totally unrestricted activity), Dr. Freilich noted that he would never place any post-bypass patient in Class 1, since that would clear him for any and all activities, including such activities as high-altitude mountaineering, which are contra-indicated for all heart patients. (Tr. 40-41.) Class 2 is the lowest category consistent with any restriction at all. Based solely on the objective indicators of heart functioning, Dr. Nesto indicated that he "would clear [Napoli] for any physical activity he wished to pursue, including training to run a marathon, starting a physical exercise program, mountaineering, or any other physical activity . . . including a return to work, without restriction." (3/31/05 Nesto Aff. ¶ 16.)

37. Dr. Nesto also noted that the absolute risk of heart attack from Napoli's returning to work is very small. Even if the stress of work significantly increased the risk of another heart attack in percentage terms, if the risk of recurrence is quite low to start with, the absolute risk would remain very low. (Id. at ¶ 11.) A prudent person would not allow such a small risk to deter him from pleasurable, lucrative, or socially constructive activities.

38. As Dr. Nesto testified, individuals who have heart attacks and serious residual heart problems regularly work in high-stress occupations, up to and including the Vice President of the United States. (Id. at ¶¶ 14-15.) Courts have reached different results in determining whether persons who have had serious heart attacks and bypass surgery are unable to return to work. Compare Pompe v. Cont'l Casualty Co., 119 F. Supp. 2d 1004 (W.D. Mo. 2000); Buffaloe v. Reliance Standard Life Ins. Co., No. 99-CV-710-BR(3), 2000 WL 33951195 (E.D.N.C. Nov. 8,

2000) with Rosenthal v. First Unum Life Ins. Co., No. 00 Civ. 3204 (LMM), 2002 WL 975627 (S.D.N.Y. May 9, 2002); Mihok v. Magnetek, Inc., No. CV0102446WJR (CWX), 2002 WL 1162843 (C.D. Cal. May 7, 2002). Accordingly, the evaluation of disability here must be based on the specific facts and circumstances of this case.

39. Plaintiff, on this record, has not proven an inability to perform the material duties of his occupation due to illness. To the contrary, the record shows that plaintiff has the physical capacity to perform his occupation and that the risk of occurrence of a coronary incident occasioned by the stress of his job if he had returned to work was so small as to be nearly non-quantifiable.

## CONCLUSIONS OF LAW

1. This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq.* ("ERISA"), specifically, under 29 U.S.C. § 1132(a)(1)(B).

2. The court has jurisdiction of this matter under 29 U.S.C. § 1132(e).

3. Section 1132(a)(1)(B) of ERISA states, in pertinent part, as follows:

> A civil action may be brought . . . by a participant or beneficiary . . . [t]o recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

4. This court performs a limited de novo review of the administrator's determination. Locher, 389 F.3d 288, 290-91, Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir. 2003); DeFelice v. Am. Int'l Life Assurance Co., 112 F.3d 61, 66 (2d Cir. 1997); Napoli v. First Unum Life Ins. Co., 2003 WL 22454481, at *3.

5. Plaintiff bears the burden of proving entitlement to a disability benefit. Juliano v. The Health Maint. Org. of N.J., 221 F.3d 279, 289 (2d Cir. 2000); Abnathya v. Hoffman-Laroche, Inc., 2 F.3d 40, 46 (3d Cir. 1993).

6. "[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Nor must they "credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." Id. Courts reviewing such decisions similarly are free to consider all the evidence, without giving special deference to the treating physician's opinion.

7. While "an insured is disabled when [a return to his employment] would aggravate a serious condition affecting the insured's health," the ultimate question is one of "common care and prudence." Lasser v. Reliance Standard Life Ins. Co., 146 F. Supp. 2d 619, 628 (D.N.J. 2001). An insured is disabled "when it is impossible for him to work without hazarding his health or risking his life." 1C-36 Appleman, Insurance Law & Practice, § 651.

8. This Court agrees with Judge Martin's observation that a "practical way" to assess disability "is to ask: Is it likely that the person would have returned to work, even if he did not have disability insurance or other substantial assets?" Napoli, 2003 WL 118504, at *3. While this is at best a rule of thumb, and not a legal standard, it reflects the fact that in our society, a party is not considered disabled from performing his job whenever there is "even the slightest risk that the stress of his work might cause another heart attack." Id. at *2.

9. In making these assessments, under the terms of this contract, Napoli's "occupation" is not the generic profession of "stockbroker" or "financial industry professional," but is Napoli's specific occupation, with all the duties and conditions that attached to it. See, e.g., Niccoli v.

14

Monarch Life Ins. Co., 332 N.Y.S.2d 803, 806 (N.Y. Sup. Ct. 1972), aff'd, 356 N.Y.S.2d 677 (N.Y. App. Term. 1974), aff'd, 36 N.Y.2d 892 (N.Y. 1975).

10. Other cases in which insureds were found to be disabled or not disabled for particular occupations are of limited assistance in evaluating this case, since every such determination must turn on the particular medical condition of the individual insured, and the particular occupation from which he or she claims to be disabled.

11. Applying these standards, and giving full weight to the objective and subjective descriptions of Napoli's employment as highly stressful, Napoli has not met his burden of proving that, due to sickness, he was unable to perform each of the material duties of his occupation as of the date on which the benefits were terminated. Given that Napoli's successful recovery places him in the top 5% of recovering bypass surgery/heart attack patients, and given the extremely low risk that either physical or psychological stress will meaningfully exacerbate the baseline risk of a heart attack present in any heart disease sufferer regardless of activity or occupation, a reasonably prudent person would not be deterred from returning to work by the risks involved. With respect to the specific issue that was the subject of the remand, for the reasons stated in the above Findings of Fact, the Court finds Dr. Nesto's conclusions about the risks to plaintiff's health from a return to work more persuasive than Dr. Freilich's.

12. Accordingly, judgment is granted in favor of First Unum Life Insurance Company confirming its administrative determination. The complaint is dismissed, and the Clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
April 21, 2005

_____
GERARD E. LYNCH
United States District Judge